IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

In re

CHARLES RICHARD WIGGINS
GWENDOLYN GAIL WIGGINS

          Debtors

Case No. 09-34282

MEMORANDUM ON TRUSTEE'S MOTION
TO COMPEL TURNOVER OF PROPERTY OF THE ESTATE

**APPEARANCES:**    LAW OFFICES OF MAYER & NEWTON
                            John P. Newton, Jr., Esq.
                            Richard M. Mayer, Esq.
                            1111 Northshore Drive
                            Suite S-570
                            Knoxville, Tennessee  37919
                            Attorneys for the Debtors

                            GENTRY, TIPTON & MCLEMORE, P.C.
                              Maurice K. Guinn, Esq.
                              Post Office Box 1990
                              Knoxville, Tennessee  37901
                              Attorneys for the Chapter 7 Trustee

Case No. 09-34282

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court upon the Motion by Maurice K. Guinn, Trustee, to Compel Turnover of Property of the Estate (Motion to Compel Turnover) filed by the Chapter 7 Trustee, Maurice K. Guinn (Trustee) on July 5, 2012, asking the court to enter an order directing the Debtors to turnover funds and a one-half interest in real property inherited by the Debtor Charles Richard Wiggins. As set forth in the Scheduling Order entered on August 6, 2012, the issues before the court are (1) whether an inheritance received by the Debtor Charles Wiggins from his mother, Violet H. Wiggins, who died on October 15, 2011, is property of the estate; and (2) whether the Debtors converted their case from Chapter 13 to Chapter 7 in bad faith, resulting in the inclusion of property in the Debtors' possession on the date of conversion within their Chapter 7 bankruptcy estate pursuant to 11 U.S.C. § 348(f)(2) (2006).

An evidentiary hearing on the Motion to Compel Turnover was held on August 29, 2012. The record before the court consists of Stipulations filed by the parties on August 22, 2012, nineteen exhibits stipulated or otherwise admitted into evidence during the trial, and the testimony of Linda Holbert and each of the Debtors. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (O) (2006).

I

The Debtors filed the Voluntary Petition commencing their Chapter 13 bankruptcy case on August 10, 2009. Their plan, which was confirmed pursuant to an Order Confirming Chapter 13 Plan (Confirmation Order) entered on October 20, 2009, provides, *inter alia*, that "[p]roperty of the estate does not vest in the debtor(s) until completion of the plan[.]" TRIAL EX. 1. Pursuant to the

Confirmation Order, the Debtors were to fund their plan for sixty months by payments of $89.00 weekly until April 2012, at which time the payments increased to $104.00 weekly until July 2013, when they were to increase to $124.00 weekly. TRIAL EX. 1. Additionally, all tax refunds in excess of $1,000.00 were to be paid into the plan, first and second mortgage payments to HFC were to be paid directly by the Debtors outside the plan, two vehicle loans were to be paid to Foothills Federal Credit Union, a timeshare with Westgate Resorts was to be surrendered in full satisfaction of the debt, and unsecured creditors were to receive a pro-rata dividend of between 5-20%. TRIAL EX. 1. During the pendency of their Chapter 13 case, secured claims totaling $116,680.77, priority unsecured claims totaling $5,927.32, and nonpriority unsecured claims totaling $25,316.48 were filed.[1] *See* TRIAL EX. 13.

On October 15, 2011, Violet H. Wiggins, mother of the Debtor Charles R. Wiggins, died testate, and Mr. Wiggins, a named beneficiary under her Last Will and Testament (Will), and his brother were appointed co-executors. TRIAL EX. 2. The Debtors did not contact the Chapter 13 Trustee's office to advise that Mr. Wiggins had received the inheritance, nor did they notify their bankruptcy attorneys about the inheritance until February 15, 2012, at which time they talked to a paralegal, Linda Holbert, who advised them to come in for a meeting on February 20, 2012. Through his mother's Will, the Debtor inherited a one-half interest in approximately thirty

---

[1] In the Stipulations filed on August 22, 2012, the parties stipulated that "[t]he total of the claims filed as unsecured claims during the pendency of the Chapter 13 case is $13,370.72." STIPS. at ¶ 2. However, the Amended Final Report submitted by the Chapter 13 Trustee reflects that total unsecured claims of $25,316.48 were allowed and, without additional information to refute the accuracy of her numbers, the court will rely on the Chapter 13 Trustee's figure. Additionally, Prudential Retirement Services filed a priority claim on August 20, 2009, in the amount of $5,927.32. The court takes judicial notice pursuant to Rule 201 of the Federal Rules of Evidence that an Order was entered on March 16, 2010, directing that the Chapter 13 Trustee would make no payments on this claim and that all payments would be made by the Debtors outside the plan.

acres located at 751 Hubbard Road, Loudon County, Tennessee (Hubbard Road Property), which he and his brother had surveyed and subdivided in March 2012. TRIAL EX. 2; TRIAL EX. 17. The Debtor also received a cashier's check from his mother's estate dated February 8, 2012, in the amount of $48,000.00 which he deposited into his personal bank account with First National Bank on that same date. TRIAL EX. 10; TRIAL EX. 11.[2] Between February 8 and February 20, 2012, the Debtors spent a portion of the $48,000.00 as follows: a check for $25,302.68 issued to HFC to pay off the balance of the second mortgage encumbering their residence; approximately $4,000.00 was given to the Debtors' daughter and granddaughter; living room furniture and a washing machine were purchased; and miscellaneous household bills, insurance premiums, and income taxes were paid. As of February 20, 2012, when they met with their attorneys, the Debtors had issued checks or otherwise distributed all but approximately $10,000.00 of the inherited funds. TRIAL EX. 12.

On February 22, 2012, after meeting with their attorneys, the Debtors filed a Notice to Convert to Chapter 7, *see* COLL. TRIAL EX. 3, together with a document entitled "Debtors' Conversion Schedules" (Conversion Schedules) where the Debtors declared under penalty of perjury that "[n]o property was acquired by the debtor after the commencement of the Chapter 13 before the entry of the conversion order, except husband is the beneficiary of the Estate of Violet Wiggins (deceased: 10/15/11) of Loudon County and will inherit from same 15 acres located at 1745 Hubbard Road, Loudon, TN[3] (unimproved); value estimated at $60,000.00." TRIAL EX. 4. Upon conversion of the Debtors' bankruptcy case, the Trustee was duly appointed, and a Notice of Chapter 7

---

[2] The Debtor testified that he also received approximately $7,000.00 as the beneficiary of his mother's life insurance policy but that he used that sum to pay for her burial costs.

[3] The address stipulated by the parties is 751 Hubbard Road. *See* STIPS. at ¶ 5. A survey of the property made on March 15, 2012, designates the property as 1741 Hubbard Road. TRIAL EX. 17.

Bankruptcy Case, Meeting of Creditors, & Deadlines was mailed to creditors and parties in interest on February 23, 2012. The Chapter 13 Trustee filed the Chapter 13 Standing Trustee's Amended Final Report and Account (Amended Final Report) on May 17, 2012, evidencing that the Debtors were in their Chapter 13 case for 33 months, exempted assets worth $17,480.19, and paid $11,748.00 into their plan from which she paid administrative expenses in the amount of $2,253.57 and principal and interest totaling $9,494.43 to Foothills Federal Credit Union on two secured claims. TRIAL EX. 13. The Amended Final Report additionally reflects that no payments were made to any nonpriority unsecured creditors. TRIAL EX. 13.

The Debtors attended their Chapter 7 meeting of creditors on May 18, 2012, at which time they disclosed to the Trustee that Mr. Wiggins had received the monetary inheritance of $48,000.00 in addition to the previously disclosed one-half interest in the Hubbard Road Property. They were subsequently granted a Chapter 7 discharge on June 8, 2012, and on July 5, 2012, the Trustee filed the Motion to Compel Turnover, to which the Debtors filed their Response to Trustee's Motion for Turnover on July 24, 2012. TRIAL EX. 14; TRIAL EX. 15.

## II

The filing of the Debtors' bankruptcy petition created their bankruptcy estate, and all property and interests in property owned by them became property of the estate. 11 U.S.C. § 541 (2006). In Chapter 13 bankruptcy cases:

> (a) Property of the estate includes, in addition to the property specified in section 541 of this title –

5

> (1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first[.]

11 U.S.C. § 1306(a) (2006). As expressly stated in their Confirmation Order, the terms of which were binding on the Debtors,[4] none of the property in their bankruptcy estate was to vest in the Debtors until completion of their plan. Because they were in the Chapter 13 case at the time Mr. Wiggins inherited an interest in the Hubbard Road Property and money through his mother's Will, both became property of the Debtors' bankruptcy estate. Accordingly, when the Debtors paid $25,302.68 to HFC on February 20, 2012, and spent another approximately $13,600.00 from the $48,000.00 inheritance while still in their Chapter 13 bankruptcy case, they were expending funds that were property of their Chapter 13 bankruptcy estate.

When a case is converted from Chapter 13 to Chapter 7, "property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion[.]" 11 U.S.C. § 348(f)(1)(A). Nevertheless, "[section] 348(f) was never designed to be a safe harbor for debtors who fraudulently and surreptitiously dispose of property of the estate while in chapter 13." *Wyss v. Fobber (In re Fobber)*, 256 B.R. 268, 279 (Bankr. E.D. Tenn. 2000). To avoid that result, subsection (f)(2) contains the following caveat: "[i]f the debtor converts a case under chapter 13 of this title to a case under another chapter under this title in bad faith, the property in the converted

---

[4] "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a) (2006).

case shall consist of the property of the estate as of the date of conversion." 11 U.S.C. § 348(f)(2). Absent a determination of bad faith, when the Debtors converted their case on February 22, 2012, the Chapter 7 bankruptcy estate consisted of only the property the Debtors owned at the time they filed their original petition on August 10, 2009, and would not have included the $48,000.00 and the Hubbard Road Property. However, if the Debtors converted their case in bad faith, as the Trustee argues, their Chapter 7 estate includes the inherited properties.

"Not all conversions from Chapter 13 to Chapter 7 with an intervening inheritance will constitute a bad faith conversion. The facts of each case must be examined." *In re Messer*, 2000 WL 33673748, at *4 n.4 (Bankr. M.D.N.C. Nov. 22, 2000). Under Sixth Circuit authority, "the totality of the circumstances drive[s] bad faith/lack of good faith determinations." *In re Smith*, 2012 WL 43647, at *2 (Bankr. N.D. Ohio Jan. 9, 2012) (citations omitted); *see also Metro. Emps. Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah)*, 836 F.2d 1030, 1033 (6th Cir. 1988) ("Good faith is an amorphous notion, largely defined by factual inquiry."). While an inference of bad faith does not arise solely because a debtor converts his or her case after acquiring assets post-petition but pre-conversion in order to take advantage of the protection afforded by § 348(f)(1), *In re Bejarano*, 302 B.R. 559, 562 (Bankr. N.D. Ohio 2003), courts should nevertheless "ascertain . . . whether [the debtor] is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is 'needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets." *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989) (citation omitted). For purposes of § 348(f)(2),

>[a] court must apply broad standards and general definitions of bad faith to the specific facts of the case to determine if there is fraud, deception, dishonesty, lack of disclosure of financial acts or an abuse of the provisions, purpose or spirit of the Bankruptcy Code. In other words, a court will have to determine if there has been an unfair manipulation of the bankruptcy system to the substantial detriment or disadvantage of creditors.

*In re Siegfried*, 219 B.R. 581, 585 (Bankr. D. Colo. 1998).

"Bad faith requires some sort of under-handed conduct or intent by the debtor in seeking and obtaining a conversion." *In re Malone*, 2011 WL 1541289, at *4 (Bankr. D. Neb. Apr. 21, 2011).

>In determining whether a Chapter 13 case has been converted in bad faith, the Court considers whether the conversion was motivated by an inability to make required payments to the Chapter 13 trustee. The Court also considers whether the debtors have been forthcoming regarding the existence of any post-petition change in circumstances that might affect their ability to make payments to their creditors and whether the conversion would create a windfall for the debtors (other than a decrease in liabilities) to which they would not have been entitled but for the existence of their pending Chapter 13 case.

*Moser v. Mullican (In re Mullican)*, 417 B.R. 389, 402 (Bankr. E.D. Tex. 2008). Factors that should be examined to ascertain a debtor's veracity include "the debtor's good faith and candor in filing schedules and other documents, whether he has engaged in 'eve of bankruptcy purchases,' and whether he was forced into Chapter 7 by unforeseen or catastrophic events." *Krohn*, 886 F.2d at 126. Additional factors include "the timing of the conversion, the chapter 13 pay history, the debtors' participation in the chapter 13 process, the amount of post-petition debt, . . . the debtors' previous bankruptcy filings, and the value of the assets in question." *Smith*, 2012 WL 43647, at *3; *see also United States Tr. v. Standifered (In re Standifered)*, 2009 WL 7831848, at *3 (D.N.M. Aug. 17, 2009) ("[T]he undisputed conduct of concealment of assets and the non-reporting of income is sufficient to find bad faith.") (citing *Siegfried*, 219 B.R. at 585-86). Similarly, the court must look

8

at conduct throughout the entire case, both pre- and post-conversion, *In re Perez*, 345 B.R. 137, 141 (Bankr. D. Del. 2006), as a debtor's actions post-conversion are relevant to "help a court ascertain the credibility of a debtor's statements regarding the motivation for conversion[.]" *Smith*, 2012 WL 43647, at *3.

The Debtors commenced their bankruptcy case on August 10, 2009, and although they were not required to do so, as evidenced by the Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income, they chose to file under Chapter 13 in order to, as testified by Mr. Wiggins, "pay some of their debts." *See* TRIAL EX. 7. This testimony is buttressed by the Debtors' Chapter 13 plan, confirmed on October 20, 2009, under which nonpriority unsecured creditors were to be paid a pro rata distribution of 5-20%. TRIAL EX. 1. It is also undisputed that when the Debtors converted their case, they were current on all payments to the Chapter 13 Trustee. Furthermore, as evidenced by the Chapter 13 Trustee's Amended Final Report, the Debtors had never been in default in their plan payments. TRIAL EX. 13. Nevertheless, because they were only 33 months into their 60 month plan when the case was converted to Chapter 7, distribution to nonpriority unsecured creditors – having allowed claims totaling $25,316.48 – had not yet commenced.

Although there is no indication that the Debtors' conduct during their Chapter 13 case was anything less than exemplary prior to October 15, 2011, the same cannot be said post-October 15, 2011. In her deposition, the Chapter 13 Trustee testified that she routinely informs debtors that they are to notify her office in the event they receive an inheritance or are a beneficiary under a life insurance policy, but that she was never notified by the Debtors that they had received any sort of

inheritance. TRIAL EX. 16 at 5, ln. 8-18. Similarly, the Chapter 13 Trustee routinely provides debtors with a green color-coded handout entitled "Chapter 13 Trustee Office Important Information and Requirements" which expressly informs debtors of the following:

> 8. If you experience a FUTURE SETTLEMENT for an insurance loss, workers' compensation personal injury, disability, inheritance or any other claim, it is an asset which you will need to report to your attorney for disclosure to the Trustee.

TRIAL EX. 18. When questioned about this handout, Mr. Wiggins testified that he received lots of paperwork and did not recall that particular item; however, the parties stipulated that the handout is one included in the packet of information given to debtors by the Chapter 13 Trustee at their meetings of creditors.

The record also reflects that the Debtors did not notify their attorneys of the inheritance until mid-February 2012, when Mr. Wiggins called and spoke with Ms. Holbert. When questioned at trial about what prompted him to call his attorneys at that time, Mr. Wiggins testified that he had been told that the land and money would go into his Chapter 13 case, and he wanted to get out of it because he was particularly concerned about the land. This testimony was reiterated by the Debtors at the trial, each of whom testified that their primary purpose for converting the case was to protect the Hubbard Road Property because it was "family land," adjoining the Debtors' home and that of Mr. Wiggins's late brother. Additionally, at their meeting of creditors, Mr. Wiggins likewise stated that the Debtors' reason for converting their case was to protect the Hubbard Road Property. Finally, the Debtors' testimony that they converted the case primarily to protect their real property is further evidenced by the fact that on February 20, 2012, Mr. Wiggins issued and mailed a check to HFC in

payment of the remaining balance on their second mortgage *prior* to the scheduled meeting with their attorneys.[5]

The Debtors' conduct immediately after receiving the inheritance as well as immediately prior to the conversion evidences to the court that their desire to protect the Hubbard Road Property – as well as the $48,000.00 – outweighed any consideration for their unsecured creditors. Additionally, notwithstanding the Debtors' statement to the contrary that it was a mistake, they did not disclose the $48,000.00 inheritance in their Conversion Schedules, even though they did advise the Trustee of the funds during their Chapter 7 meeting of creditors.[6] Based upon a totality of the circumstances and examining all of the relevant factors, the court finds that the Debtors consciously attempted to manipulate the bankruptcy system to the detriment of their unsecured creditors when they converted their case to Chapter 7, thus necessitating a finding that their case was converted in bad faith. Accordingly, pursuant to § 348(f)(2), all property acquired during the pendency of the Debtors' Chapter 13 bankruptcy case, including the Hubbard Road Property and the remaining $10,000.00 from the $48,000.00 cash inheritance, is property of their Chapter 7 bankruptcy case and subject to administration by the Trustee.

The record is clear. The Debtors received the $48,000.00 check from Mrs. Wiggins's estate on February 8, 2012, which they then deposited into Mr. Wiggins's bank account with First National

---

[5] This check did not clear Mr. Wiggins's account until February 28, 2012, six days after the Debtors converted their Chapter 13 case to Chapter 7.

[6] The Debtors both testified that they disclosed the $48,000.00 to their attorneys when they met with them on February 20, 2012, leaving the inference that it was the attorneys who failed to list this portion of Mr. Wiggins's inheritance in the Conversion Schedules. Given that the Debtors reviewed and signed the Conversion Schedules under penalty of perjury, the court does not find this explanation plausible or acceptable.

11

Bank. As reflected by the Debtors' bank statement for February 2012, which was introduced into evidence as Trial Exhibit 11, the Debtors deposited $44,000.00 on February 8, 2012. When questioned about the other $4,000.00, Mr. Wiggins testified that he gave $2,000.00 to his daughter and another $2,000.00 to his granddaughter for a wedding gift. Thereafter, between February 8 and February 24, 2012, debits and checks totaling $8,358.28 cleared the account, including, notably, $350.33 to Wal-Mart and a number of unidentified checks in amounts such as $110.00, $2,125.50, $871.95, $850.00, $674.00, $1,275.00, $772.08, $503.00, and $198.00, leaving a balance as of February 24, 2012, of $37,352.66. TRIAL EX. 11.

As of February 22, 2012, the Debtors had met with their attorneys and filed the Conversion Schedules that did not disclose the existence of the $48,000.00 inheritance. Nevertheless, the check to HFC had not yet cleared Mr. Wiggins's bank account,[7] and there were sufficient funds to pay the Debtors' unsecured creditors in full and still have $12,049.98 that they could have paid towards their second mortgage and reduced that obligation as well by approximately half. The Debtors likewise had another option that would not have been detrimental to their unsecured creditors: they could have stopped payment on the HFC check and then paid the remaining $37,352.66 into the Chapter 13 case, which would have paid the case out in full and accomplished the Debtors' stated goal for converting the case – protecting the Hubbard Road Property because they would have had a surplus of funds. When questioned during cross-examination about how they spent the unaccounted for $8,700.00, Mr. Wiggins stated that he used some of the $44,000.00 to purchase living room furniture and a washing machine, to pay insurance on his car and home, and to pay income taxes of

---

[7] As noted in n.5, *infra*, this check cleared Mr. Wiggins's account at First National Bank on February 28, 2012.

12

approximately $750.00. Mr. Wiggins also testified that he did not realize that he had enough cash to pay off his unsecured debts without disturbing the real property he had inherited. The court, however, finds this testimony to be somewhat disingenuous in light of the fact that the Debtors were well aware that they had at least $10,000.00 after paying off their second mortgage in full and that they had only scheduled unsecured debts of approximately $21,000.00 in 2009.

Unlike many of the cases in which there is a significant change in circumstances that necessitates conversion in addition to an inheritance or other monetary windfall, in this case, the only change in circumstances was the inheritance. Mr. Wiggins was retired at the time the Debtors filed their case and has been receiving social security disability throughout that time. Mrs. Wiggins was employed at the time they filed and is still with the same employer. Additionally, Mrs. Wiggins is the party funding the plan and although she testified that life during the pendency of their Chapter 13 case was "tight," and that they lived paycheck to paycheck, such is the case for most Chapter 13 debtors who are required to commit their disposable monthly income into a plan. Notwithstanding the "tightness" of the Debtors' budget, they made their plan payments throughout the 33 months they were in their Chapter 13 case, and plan payments were current at the time of conversion. These factors weigh against the Debtors, as does the fact that they spent nearly $38,000.00 in two weeks, a portion of which was furniture, appliances, gifts to family members, and payment of the second mortgage on their house. It is also significant that the Debtors had the means to pay their case off in full but that they converted prior to paying anything to their unsecured creditors. *See Smith*, 2012 WL 43647, at *4.

For the foregoing reasons, the court finds that the Debtors converted their Chapter 13 case in bad faith. The inherited property consisting of the remaining funds in the amount of $10,000.00 and the Hubbard Road Property are property of their converted Chapter 7 bankruptcy case and subject to administration by the Trustee. An Order consistent with this Memorandum will be entered.

FILED: September 7, 2012

BY THE COURT

*/s/ RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE